1
2
3
4
5
6
7

8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

11 | CAROLYN BROWN,

Case No. 1:20-cv-00186-NONE-SAB

12 |         Plaintiffs and Counter-
                Defendants,

**FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

13 |     v.

14 | PROPERTY AND CASUALTY
INSURANCE COMPANY OF HARTFORD,

(ECF Nos. 69, 70, 72, 76, 77, 80)

15 |

**OBJECTIONS DUE WITHIN THIRTY DAYS**

16 |         Defendant and
                Counterclaimant.

17
18
19

## I.

20

## INTRODUCTION

21          Currently before the Court is Defendant and Counter-Claimant Property and Casualty

22   Company of Hartford's ("Defendant" or "Hartford") motion for summary judgment, or

23   alternatively partial summary judgment on Plaintiffs' claims for breach of contract, breach of

24   implied covenant of good faith and fair dealing, and punitive damages, as well as on Defendant's

25   Hartford's counterclaim for declaratory relief.  (ECF No. 69.)  This matter has been referred to

26   the assigned magistrate judge pursuant to Local Rule 302(c) and 28 U.S.C. § 636(b)(1)(A).  The

27   Court finds Defendant's motion for summary judgment suitable for decision without oral

28   argument.  L.R. 230(g).  Having considered the moving papers, the declarations and exhibits

1  attached thereto, the parties' statements of facts, as well as the Court's file, the Court issues the

2  following order recommending granting Hartford's motion for summary judgment.

3  **II.**

4  **BACKGROUND**

5  On January 9, 2020, Plaintiffs Carolyn Brown ("Brown") and Mecca Morgan

6  ("Morgan"), appearing *pro se*, filed this property insurance coverage dispute action in the

7  Superior Court of California, County of Madera, with the action bearing case number

8  MCV082926.  (ECF Nos. 1 at 2; 1-1.)[1]  On February 5, 2020, pursuant to 28 U.S.C. §§ 1441, and

9  1446, Defendant Property and Casualty Insurance Company of Hartford ("Defendant" or

10  "Hartford"), removed the action to the U.S. District Court for the Eastern District of California.

11  (ECF No. 1.)  Morgan was named as a Third Party Defendant by the August 5, 2020 filing of

12  Defendant's counterclaim and third party complaint.  (ECF No. 25.)[2]

13  On July 12, 2021, Defendant filed a motion for summary judgment, or alternatively

14  partial summary judgment on Plaintiffs' claims for breach of contract, breach of implied

15  covenant of good faith and fair dealing, and punitive damages, as well as on Defendant's

16  Hartford's counterclaim for declaratory relief.  (Def.'s Mot. Summ. J. ("Mot"), ECF No. 69.)

17  Defendant also filed a statement of undisputed facts in support of the motion for summary

18  judgment or alternatively partial summary judgment.  (ECF No. 70.)  On the same date, July 12,

19  2021, Plaintiffs also filed a document entitled "joint statement of disputed facts in support of

20  [Plaintiffs'] motion to object to summary judgment."  (ECF No. 72 (capitalization altered).)  On

21  August 10, 2021, Defendant file a notice of failure to oppose the motion for summary judgment,

22

23  _____

[1] All references herein to pagination of electronically filed documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

24

25  [2] While Mecca Morgan's name was initially written in on the complaint filed in state court as a plaintiff, the name "Mecca Morgan" was  crossed out on the complaint, and "et al." was written in.  (ECF Nos. 1 at 1, 1-1 at 2, 1-2 at 2.)  Defendant proffered the name was presumably stricken because of the *pro se* status of Brown and the fact that

26  the complaint was not signed by Morgan.  It is not clear whether Morgan was in fact stricken from the complaint, or if the state court or parties crossed out the name and wrote in "et al." in order to signify other plaintiffs were joining

27  the action.  Because no formal motion to strike or dismiss has been adjudicated in this Court, and based on the face of the complaint as filed, the Court finds Morgan and Brown to be Plaintiffs and Counter-Defendants, and Hartford to be a Defendant and Counterclaimant.  For ease of reference herein, the Court shall refer to Brown and Morgan as

28  "Plaintiffs," and Hartford as "Defendant."

proffering Brown and Morgan failed to comply with Local Rule 230.   (ECF No. 76.)
Concurrently, Defendant filed a response to the Plaintiffs' July 12, 2021 filing.  (ECF No. 76-1.)
On October 15, 2021, the motion for summary judgment was referred to the assigned magistrate
judge for the preparation of findings and recommendations or other appropriate action.  (ECF
No. 80.)

## III.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary
judgment if the movant shows that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks
omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).   Summary
judgment must be entered "against a party who fails to make a showing sufficient to establish the
existence of an element essential to that party's case."  Celotex Corp. v. Catrett, 477 U.S. 317,
322 (1986).  "[A] party seeking summary judgment always bears the initial responsibility of
informing the district court of the basis for its motion, and identifying those portions of 'the
pleadings, depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."
Celotex Corp., 477 U.S. at 322.

If the moving party meets its initial responsibility, the burden then shifts to the opposing
party to establish that a genuine issue as to any material fact actually does exist.  Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Each party's position,
whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular
parts of materials in the record, including but not limited to depositions, documents, declarations,
or discovery; or (2) showing that the materials cited do not establish the presence or absence of a
genuine dispute or that the opposing party cannot produce admissible evidence to support the
fact.  Fed. R. Civ. P. 56(c)(1).  The Court may consider other materials in the record not cited to
by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco
Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz.,

1  609 F.3d 1011, 1017 (9th Cir. 2010

2       "In judging the evidence at the summary judgment stage, the court does not make

3  credibility determinations or weigh conflicting evidence," Soremekun v. Thrifty Payless, Inc.,

4  509 F.3d 978, 984 (9th Cir. 2007) (citation omitted), and it "must draw all reasonable inferences

5  in favor of the non-moving party, and determine whether a genuine issue of material fact

6  precludes entry of summary judgment," Comite de Jornaleros de Redondo Beach v. City of

7  Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (citations omitted).

8                                      **IV.**

9                                  **DISCUSSION**

10   **A.    The Complaint and Counterclaim**

11       The Court shall reproduce the entirety of the Plaintiffs' complaint here, initially filed in

12  state court:

13           As of December, 2019, I have been out of my house for almost 1
14           year.  The Hartford group and its employees have acted in bad
             faith toward me and the claim that I filed.  I have paid my
15           insurance premium to Hartford for the last 10 years.  However,
             since I've filed this claim they have treated me in bad faith, for
16           example, my home contains black mold in the installation, of
             which as remained since the opening of my claim and was
17           supposed to be remedied almost a year ago.  In addition, and
             according to the construction company, Calwest, hired by the
18           insurance company, two of my rooms still have septic water carpet,
             which should have been removed by now.  Moreover, there are
19           items that Calwest removed such as a stove and dishwasher that
             were never properly stored for preservation and are now eroded
20           and cannot be put back in my house.

21           John English, the original insurance adjuster assigned to my claim
             came to my home with a "leak detector person" who was asked by
22           Mr. English to remove the baseboard in my presence, and mold
             spores got in my nostrils, causing me to become ill, followed by
23           sinus pain and headaches, of which I continue to suffer from.  This
             was diagnosed by my doctor and further discovered by my dentist
24           along with a dark circle found in my sinus cavity.  I am still under
             doctor's care.

25           Upon the opening my claim, the insurance company has acted in
26           bad faith in the reimbursement of my food expenses.

27           In another example of bad faith, Hartford hired Calwest, a
             company that committed the crime of theft of my rugs which were
28           to be left to my children as family heirlooms; my daughter and I
             gave clear directions as to what to do with the rugs, but our request

                                        4

went ignored and the rugs are gone, and I have yet to be paid the correct amount for my loss.

So, my confidence in Calwest decreased to zero because I cannot have confidence in someone who steals from me. Calwest, before they were hired told me that they would not be completing my foundation work as they were told not to by the insurance company, this was a surprise to me because they are a licensed construction company; another act of bad faith, the Hartford group set me up to fail by insisting that Calwest not work on my home thus by tainting the process because I was told that a construction company would come to my home to give me a fair estimate on the cost to put my home back together. Why would the insurance company select a company to give me an estimate that was not willing to do the job in its entirety which was the point from the beginning. Acting in bad faith, Cyrilla Harris hired them to not complete the work. Which brought more stress and delays. Calwest was so adamant about not completing the work because of foundation issues which they said they would not work on. They made me sign a paper and the paper stated that they do not do any foundation work. However, as soon as they began to tear things out in my house the first thing that they ripped up was the foundation in my master bedroom after they told me they weren't going to touch it. In another example of bad faith that same company, pulled out my specialty tile around my master bath tub that another company had already worked on. So, what Mrs. Harris gave them permission to do they did not, but instead they did something else which caused two of my rooms that should have been torn out were not torn out and that work is sitting in the same condition to this today. Calwest, the company hired by the Hartford insurance company, once again acted in bad faith toward me and tried to record every word I said and tied to use everything that I sad against me as they reported back to Cyrilla Harris. They were never working on my behalf they were working on behalf of the Hartford and Cyrilla Harris.

Mrs. Harris orchestrated this deal with Calwest against me and so when they got there they were already tainted by Mrs. Harris. Also, I was injured a second time because of Mrs. Harris negligence toward me, I was housed at the La Quinta Inn at the same period of time, waiting for the work to be done on my house when I had ALE Solutions which is my housing contact. I asked them if they could ask Mrs. Harris to move me from the hotel because they were spraying pesticides on the third floor of the hotel, my family and I were on. Mrs. Harris refused to give them authority to move us, therefore, pesticides was sprayed on the floor that we were on and I ended up in the hospital. So, one again I was injured a second time due to the bad faith of the Hartford group.

I sent in a second claim and when I try to discuss it with Cyrilla Harris and Donald Behner they never respond to me that my second claim was approved and they never told me it was not approved. In addition and another example of bad faith, the Hartford group are trying to force a settlement for approximately, $38,000 when my daughter, Mecca Morgan was told person who

produced the estimate, relied upon by the Hartford Group that my home would cost approximately $120,000; this is deception and bad faith.  In conclusion the second claim that I filed the engineer that was hired by the Hartford group wrote up the report in my favor.  However, Cyrilla Harris and Donald Behner which are employees of the Hartford group had the engineer to come back out and file a report that would be in the favor of the Hartford group.  I find that behavior to be bad faith and injustice to my claim therefore I am filing this lawsuit for the full amount that is on my policy.  If we have to go to court I am asking for damages for my health for both times I was injured separately.

(ECF No. 1-1 at 3-5.)

On August 5, 2020, Defendant filed a counterclaim against Brown and Morgan.  (ECF No. 25.)  Defendant alleges common facts exist underlying the complaint and counterclaim as follows: (1) on or about March 20, 2018, Hartford issued policy number 55 RBE351238 to Brown and Morgan providing homeowners coverage for a residence located at 26933 Fonda Avenue, Madera, California (the "Property"); (2) the policy was renewed for the 2019-2020 policy year; (3) on or about January 13, 2019, Brown and Morgan reported a loss, allegedly due to sewer backup at the Property, that was assigned claim number PP0018183284 by Hartford (the "Sewer Backup Claim"); (4) on or about July 3, 2019, during the course of the investigation and adjustment of the Sewer Backup Claim, Hartford became aware of alleged damage to the foundation of the Madera residence, and that claim was assigned claim number PP0018382967 by Hartford (the "Foundation Claim"); (5) on or about January 30, 2020, Brown and/or Morgan reported damage to the ceiling in the garage of the Madera residence, and that claim was assigned claim number PP0018620701 by Hartford (the "Garage Ceiling Claim"); (6) Hartford investigated and adjusted each of the claims; (7) for the Sewer Backup Claim, Hartford paid a total of $155,288.66, including $76,584.36 for loss of use also known as additional living expenses, paid primarily to vendors who provided housing, with $2,157.79 being paid directly to Brown; (8) for the Sewer Backup Claim, Hartford additionally paid a total of $78,704.30 for contents, repairs, and packout and storage of personal property, with $9,054.08 being paid directly to Brown; (9) Hartford declined the Foundation Claim on a number of grounds, primarily that it was caused by tree root conditions which had been known and causing damage since at least 2005, years before Hartford began to insure Brown and Morgan; and (10) Hartford

declined the Garage Ceiling Claim on a number of grounds, primarily that the damage had manifested itself years before Hartford began to insure Brown and Morgan.  (ECF No. 25 at 2-3.)

Hartford's first claim is for declaratory relief on the Sewer Backup Claim, seeking a declaration that it has paid all sums owed to Brown and/or Morgan for the sewer backup loss occurring on or about January 13, 2019.  (ECF No. 25 at 3-4.)  Hartford's second claim is for declaratory relief on the Foundation Claim, seeking a declaration that the claimed slab damage reported in July of 2019 is not covered by any of the Hartford policies.  (Id. at 5.)  Hartford's third claim is for declaratory relief on the Garage Ceiling Claim, seeking a declaration that the claimed garage ceiling damage reported in January of 2020 is not covered by of the Hartford policies.  (Id. at 5-6.)

**B.     The Parties' Statements of Disputed and Undisputed Facts**

Defendant proffers that it attempted to meet and confer with Plaintiffs several times concerning this motion and the joint statement of undisputed facts, however, Plaintiffs refused to meet and confer or participate with Defendant.  (ECF Nos. 69 at 2, 70 at 1; Declaration of Linda B. Oliver Supp. Mot. Summ. J. ("Oliver Decl.") ¶¶ 4-6, ECF No. 69-33; Decl. Andrew B. Downs Supp. Mot. Summ. J. ("Downs Decl.") ¶¶ 3-6, ECF No. 69-35.)  Thus, Defendant has filed its own statement of facts that it proffers are undisputed.  (ECF No. 70.)

On July 12, 2021, Plaintiffs also submitted what is titled a "joint statement of disputed facts in support of [Plaintiffs'] motion to object to summary judgment."  (ECF No. 72 (capitalization altered).)  The document also uses the term "undisputed" in describing itself.  (Id.)

On August 10, 2021, Defendant filed a notice of Plaintiffs' failure to file an opposition to Defendant's motion for summary judgment.  (ECF No. 76.)  Defendant also filed a response and objections to the joint statement of disputed facts filed by Plaintiffs.  (ECF No. 76-1.)  Defendant proffers that given the Plaintiffs' filing incorporates information from an earlier draft provided by Defendant during the meet and confer process (which Plaintiffs refused to participate in), Defendant believes the Plaintiffs' statement was prepared before Defendant filed its motion for summary judgment.  Thus, Defendant contends the Plaintiffs' filed statement is not in response to the statement or motion for summary judgment actually filed by Defendant, as the motion was

1   served on Plaintiffs by overnight mail on the same date, July 12, 2021.  Accordingly, Defendant

2   submits the filing is not an opposition and response anticipated by Local Rule 260(b).[3]  Indeed,

3   Defense counsel proffers it has repeatedly informed Plaintiffs, including in the notice of motion,

4   that Plaintiffs' opposition was due on August 3, 2021 under the Local Rules.

5         Arguing the Plaintiffs' statement is unsupported by authenticated evidence and includes

6   facts that are not material to the issues raised by this motion, Defendant objects to each fact and

7   statement individually.  Defendant submits the Plaintiffs' statement does not comply with the

8   requirements for an opposition or joint statement under Federal Rule of Civil Procedure 56, or

9   Local Rules 230 and 260(b), and does not contain admissible evidence.  (ECF No. 76 at 1-2, 76-

10  1 at 1.)  Based on the Court's review of the parties' filings in totality and the proffer of the

11  failure to meet and confer, and the fact a true opposition to the filed motion for summary

12  judgment was never filed by the Plaintiffs, the Court finds it may appropriately accept

13  Defendant's statement of facts as undisputed and find Defendant's motion to be essentially

14  unopposed, as explained in greater detail below in subsection IV(D), infra.

15        1.    The Court's Findings Concerning the Individually Submitted Facts

16        Plaintiffs have responded to Defendant's with a proffered refutation, or additional facts in

17  some instances.  The Court shall now proceed in discussing each of the Defendant's proffered

18  undisputed facts, and the Plaintiffs' filing, where applicable.  For the reasons explained below,

19  the Court finds each of Defendant's proffered facts to be unrefuted by Plaintiffs' filing, and

20  accepts each of Defendant's facts as undisputed.  Where Plaintiffs offer additional facts that

21

22  [3] Local Rule 260(b) provides the following:

23        Any party opposing a motion for summary judgment or summary adjudication shall reproduce the itemized
          facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are

24        disputed, including with each denial a citation to the particular portions of any pleading, affidavit,
          deposition, interrogatory answer, admission, or other document relied upon in support of that denial.  The

25        opposing party may also file a concise "Statement of Disputed Facts," and the source thereof in the record,
          of all additional material facts as to which there is a genuine issue precluding summary judgment or

26        adjudication.  The opposing party shall be responsible for the filing of all evidentiary documents cited in
          the opposing papers.  See L.R. 133(j).  If a need for discovery is asserted as a basis for denial of the motion,

27        the party opposing the motion shall provide a specification of the particular facts on which discovery is to
          be had or the issues on which discovery is necessary.

28  L.R. 260(b).

1   Defendant does not dispute, the Court will also accept such facts as undisputed.

2   **Undisputed Fact ("UF") 1.**  Defendant Property and Casualty Insurance Company of

3   Hartford issued homeowners insurance policies to plaintiffs Carolyn Brown and her daughter,

4   Mecca Morgan, on their home on Fonda Avenue in Madera, California for the policy period

5   starting on March 20, 2014.  The policy was renewed for the through the 2020-2021 policy year.

6   (Decl. Cyrilla Carlile-Harris Supp. Mot. Summ. J. ("Carlile-Harris Decl.") ¶ 4, ECF No. 69-2;

7   Exs. 1, 2, 3, 4, ECF Nos. 69-3, 69-4, 69-5, 69-6.)

8   Discussion:  Plaintiffs' filing responds in relevant part that the policy was never cancelled

9   until Hartford canceled it in March of 2021.  (ECF No. 72 at 2.)  Defendant responds that

10   Plaintiff does not dispute that coverage was effective March 2014 through March 2021, and

11   Hartford does not dispute that it did not renew the policy after the 2020-2021 term, however,

12   proffers the fact is immaterial to any issue raised by the motion because the losses predated the

13   policy term and are not covered.  (ECF No. 76.)  The Court finds the UF 1 may be accepted as

14   undisputed, as submitted.

15   **UF 2.**  The policy issued effective March 20, 2018 ("the Policy") had a limit of liability

16   for damage to the dwelling of $362,000 and $72,400 for loss of use.  (Ex. 1 at H-POL000076.)

17   Discussion:  Plaintiffs' filing adds additional information concerning the limits for

18   additional coverage, including personal property for $253,400, other structures for $36,000,

19   personal liability for $300,000, and medical payments to others for $1,000.  (ECF No. 72 at 2.)

20   Defendant responds that it does not dispute the additional coverage, but such additional

21   coverages are not relevant to whether the claimed losses are covered under the policy, and there

22   are no claims involving other structures, personal liability, or medical payments to others.  The

23   Court finds that UF 2 may be accepted as undisputed, as submitted.  The Court finds the other

24   amounts proffered by Plaintiffs are also undisputed.

25   **UF 3.**  The Policy provides coverage for the residence premises as follows:

26   **SECTION I – PROPERTY COVERAGES**

27   **A. Coverage A – Dwelling**

28   1. We cover:

9

a. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

b. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises".

2. We do not cover land, including land on which the dwelling is located.

(Carlile-Harris Decl. ¶ 4, Exh. 1 at HPOL000102.)

Discussion: Plaintiffs' response states: "**Extended replacement cost coverage**," and "See Notice to consumers—California residential insurance disclosure Pg. 1. HPOL000146." (ECF No. 72 at 2.)  Defendant responds that Plaintiffs' cited language is included in a notice included with the 2020- 2021 policy.  (Carlile-Harris Decl.,Ex. 4 at H-POL000146, ECF No. 69-6.)  Defendant states that the Plaintiffs' citation is irrelevant and immaterial because no covered losses occurred during the 2020-2021 policy period.  However, Defendants acknowledge there is also a notice included with the relevant policy, effective 2018-2019, which explains what "extended replacement cost coverage" is, but also states the disclosure is required by the California Insurance Code and "is not part of your residential property insurance policy," and that "[o]nly the specific provisions of your policy will determine whether a particular loss is covered and the amount payable."  (Ex. 1 at HPOL000074.)[4]  The Court finds that UF 3 may be accepted as undisputed, as presented.

**UF 4.**  The Section I Conditions provide that the policy only covers losses occurring during the policy period:

P. Policy Period

This policy applies only to loss which occurs during the policy

---

[4] The Court notes that this page also states: "You have purchased the coverage(s) checked below."  (Ex. 1, ECF No. 69-3 at 8.)  The Extended Replacement Cost Coverage section is checked.  (Id.)  It provides that Extended Replacement Coverage "is intended to provide for the cost to repair or replace the damaged or destroyed dwelling without a deduction for physical depreciation.  Many policies pay only the dwelling's actual cash value until the insured has actually begun or completed repairs or reconstruction on the dwelling.  Extended Replacement Cost provides additional coverage above the dwelling limits up to a stated percentage or specific dollar amount.  See your policy for the additional coverage that applies."  (Id.)  This appears consistent with the terms highlighted in UF 5.

1    period.

2   (Carlile-Harris Decl., Exh. 1 at H-POL000114.)

3        Discussion: Plaintiffs stated this is undisputed (ECF No. 72 at 2), and thus the Court

4   accepts UF 4 as undisputed.

5        **UF 5.** The Policy provides:

6            . . . Covered property losses are settled as follows:

7            2. Buildings covered under Coverage A or B at replacement cost
             without deduction for depreciation, subject to the following:
8            . . .
             d. We will pay no more than the actual cash value of the damage
9            until actual repair or replacement is complete.  Once actual repair
             or replacement is complete, we will settle the loss as noted in 2.a.
10           and
             b. above.
11           . . .
             e. You may disregard the replacement cost basis settlement
12           provisions and make claim under this policy for loss to buildings
             on an actual cash value basis. You may then make claim for any
13           additional liability according to the provisions of this Condition C.
             Loss Settlement, provided you notify us of your intent to do so
14           within 180 days after the date of loss.

15  (Carlile-Harris Decl., Ex. 1 at HPOL000112-113, ECF No. 69-3 at 46-47.)

16       Discussion: Plaintiffs' response states that "[i]n my extended policy it states 'Extended

17  replacement cost coverage is intended to provide for the cost to repair or replace the damaged or

18  destroyed dwelling without a deduction for physical depreciation.  Many policies pay only the

19  dwelling's actual cash value until the insured has actually begun or completed repairs or

20  reconstruction on the dwelling.  Extended Replacement Cost provides additional coverage above

21  the dwelling limits up to a stated percentage or specific dollar amount. See your policy for the

22  additional coverage that applies.' " (ECF No. 72 at 3.)  Defendant's reply is the same as UF 3.

23  The Court notes that this undisputed fact only incorporates certain terms of the effective policy,

24  that it doesn't appear inconsistent with the notice cited by Plaintiffs, and the Court finds UF 5 to

25  be undisputed as presented.

26       **UF 6.** The Policy provides:

27            **H.    Our Option**

28                If we give you written notice within 30 days after we

                                        11

> received your signed, sworn proof of loss, we may repair or replace any part of the damaged property with material or property of like kind and quality.

(Carlile-Harris Decl., Ex. 1 at HPOL000114, ECF No. 69-3 at 48.)

Discussion: Plaintiffs again cite to the notice located at HPOL000146.  (ECF No. 72 at 3.)  Defendant's reply is the same as to UF 3 and 5.  (ECF No. 76 at 5-6.)  The Court does not find Plaintiffs' response to dispute the factual content concerning the term of the policy, and finds UF 6 to be undisputed.

**UF 7.**  Brown and Morgan reported the first claim, due to a sewage backup, to Hartford on January 13, 2019.  (Carlile-Harris Decl., ¶ 5.)

Discussion: This fact is undisputed by Plaintiffs (ECF No. 72 at 3), and thus the Court accepts UF 7 as undisputed.

**UF 8.**  For the sewage backup claim, Hartford paid a total of $155,288.66.  (Carlile-Harris Decl ¶ 7; Ex. 13, ECF No. 69-15.)

Discussion: Plaintiffs respond that Renaissance General Restoration Contracting Inc. was paid $18,781.51 for demolition; Calwest was paid $16,624.81 for demolition; "Housing loss $72,400 which Hartford [] paid to housing vendors[;] $38,860.21 was paid on 1/9/20 as a part of dwelling settlement[;] [and] Disputed payment $6,546.69."  Plaintiffs cite to "Exhibit 33, HCL284-00213."  (See ECF No. 72 at 41.)  Defendant replies that Plaintiff does not provide any evidence to dispute this fact except for a claim summary which indicates that the amount paid was $155,288.66 as stated in the original fact, and that there is no evidence that there is a disputed payment of $6,546.69.  The accounting that Plaintiffs attach their filing appears to be a similar accounting spreadsheet with the same total amount of $155,288.66, contained therein.  (Compare ECF No. 72 at 41, with ECF No. ECF No. 69-15.)  The Court finds UF 8 to be undisputed.

**UF 9.**  Hartford paid a total of $76,584.36 for loss of use, also known as additional living expenses, to accommodate Ms. Brown and her family.  This amount is $4,184.36 more than policy limits, because of the timing of receipt of vendor invoices Hartford had agreed to pay.

1  (Carlile-Harris Decl., ¶¶ 7, 8; Ex. 13, ECF No. 69-15.)

2      <u>Discussion:</u>  Plaintiffs respond that under "Policy 55RBE351238 on page 2 of 4 it states

3  'loss of use was raised $76,600.' "  (ECF No. 72 at 3..)  Plaintiffs cite to "H-9800-0 pg. 1 of 4."

4  (ECF No. 72 at 10.)  The Court notes Plaintiffs' attachment does state a loss of use limit in a

5  greater amount, appearing to be $78,600.  (ECF No. 72 at 10.)  The title page of this document

6  appears to be "Your Home Renewal Policy Declarations."  (<u>Id.</u> at 9.)  The document states the

7  policy effective date is March 20, 2020, expiring on March 20, 2021.  (<u>Id.</u>)  On the next page in

8  Plaintiffs' filing, is an endorsement page for the Policy with an effective date of March 20, 2018,

9  until March 20, 2019, and which does state that coverage for loss of use is $72,400.  (ECF No.

10  72 at 11.)  Defendant did not directly object or respond to Plaintiffs' proffer in their filing, and it

11  is not clear to the Court whether this was an unintentional omission.  (See ECF No. 76 at 8.)

12  Nonetheless, UF 2 already establishes that the Policy issued effective March 20, 2018, had a

13  limit of liability of $72,400 for loss of use.  (Ex. 1 at H-POL000076.)  Plaintiffs' citation appears

14  to pertain to a different policy year.  Plaintiffs have failed to demonstrate a dispute as to the

15  proffer contained in this UF 9, and the Court finds UF 9 is undisputed.

16      **UF 10.**  Hartford also paid a total of $78,704.30 for repairs and related work.  (Carlile-

17  Harris Decl. ¶ 9; Ex. 13.)

18      <u>Discussion:</u>  Plaintiffs respond that "[n]o repairs were made by the Hartford group,

19  Calwest, Renaissance"; that no repairs were made by any contractor the Hartford sent to the

20  Property; that there are no receipts for repairs made in the exhibits the Defendant presented; and

21  that there was only demolition work done.  (ECF No. 72 at 4.)  Plaintiffs again cite an Exhibit

22  33, HCL284-00213," which as discussed above, appears to be an accounting spreadsheet with a

23  grand total of $155,288.66.  (ECF No. 72 at 41.)  Defendant responds that there was no coverage

24  for the damage to the foundation, so Hartford was not obligated to pay for repairs to the

25  foundation; that Plaintiff's fact is immaterial to any issue raised by Defendant's motion; and

26  Plaintiffs' citation does not support the contention that no repairs were made.  The Court finds

27  UF 10 to be undisputed given Plaintiffs' lack of meaningful demonstration of its disputed nature

28  and failure to cite evidence in support of the dispute.

1     **UF 11.**  Those repair payments included the cost of repairs performed and the actual cash

2  value for those repairs not yet performed.  (Carlile-Harris Decl. ¶ 9; Ex. 13.)

3     Discussion: Plaintiffs respond that a payment of 38,860.21 was paid after the lawsuit was

4  filed against Hartford, issued on February 11, 2020, one year after the original claim was filed.

5  (ECF No. 72 at 4.)   Defendant replies that there was no coverage for the damage to the

6  foundation, so it was not obligated to pay for repairs to the foundation; that Plaintiffs' fact is

7  immaterial to any issue raised by the motion; that Plaintiff does not provide any authenticated,

8  admissible evidence in support of this fact; and that Hartford does not dispute the payment, but it

9  is irrelevant and immaterial.  (ECF No. 76 at 9.)  The Court finds UF 11 undisputed.  The Court

10  will additionally accept Plaintiffs' proffered fact of a payment of $38,860.21 issued on February

11  11, 2020, given Defendant does not dispute such proffer.   The Court does not gleam the

12  relevance of the payment, however, the Court notes it does not appear to be included in the list of

13  payments at Defendant's Exhibit 13, with the last date of issued payments being January 24,

14  2020.  (ECF No. 69-15.)

15     **UF 12.**  The foundation of the property has not been repaired, and no further repair work

16  has been done since the demolition in 2019.  (Oliver Decl. ¶ 2; Dep. Mecca Morgan ("Morgan

17  Dep.") 172:14-173:15, Ex. 26.)[5]

18     Discussion: Plaintiffs respond that on 8/31/19 Credit World Construction an outside

19  vendor I myself hired, repaired the foundation, stating to see "repaired foundation picture Exhibit

20  12."  (ECF No. 72 at 4.)  Defendant replies that in its requests for production of documents to

21  plaintiffs, Hartford requested all documents regarding repairs to the property from 2004 to

22  present; that Plaintiffs did not produce any documents from Credit World Construction regarding

23  the foundation; that Plaintiffs did not identify Credit World Construction in or any related photos

24  or documents in their initial disclosures; that Plaintiffs do not provide any evidence in support of

25  their allegation that the foundation has been repaired except for a picture that is not authenticated

---

27  [5]  Morgan testified that: "But as far as repairing things under Hartford's umbrella, I'm going to say repairing –

considering what we -- who we've hired to come out, I would say no, not -- not anything that they demo'd.  That's

28  (inaudible) repairs had to be demo'd. . . . The repair – the demolition, there has nothing been completed since the

demolition.  Nothing's been repaired from what they demo'd."  (Morgan Dep. at 172:14-173:15.)

and is mostly just black ink; and that Morgan also testified at her deposition that the foundation had not been repaired.  (ECF No. 76 at 9-12.)  The Court finds that UF 12 to be undisputed given Plaintiffs have failed to submit admissible or convincing evidence to refute the proffered fact, particularly given Plaintiff has provided no discovery on this purported repairing of the foundation.  As Defendant highlights, the lone picture provided by Plaintiff in support of the contention is essentially unviewable.  (See ECF No. 72 at 47.)

**UF 13.**  In the midst of the repair and remediation process in 2019-2020, the County of Madera informed the contractors that it would not issue permits for the remainder of the repairs unless cracking/movement in the slab foundation were repaired first.  It also required that the foundation be inspected by a third party to verify the structural integrity of the foundation of the home.  A contractor from CalWest also stated that no repairs could be started of the damage caused by the sewage leak unless the foundation was repaired.  (Carlile-Harris Decl. ¶¶ 10, 11; Ex. 6, 7, ECF Nos. 69-8, 69-9; Decl. Courtney Sorge ("Sorge Decl.") ¶¶ 3, 4, ECF No. 69-37; Exs. 28, 29, ECF Nos. 69-38, 69-39; Morgan Dep. at 66:22-67:9; 68:20-69:21, 87:15-21, 88:22-89:3; Downs Decl. ¶ 2, ECF No. 69-35; Dep. Carolyn Brown ("Brown Dep.") at 84:4-18, Ex. 27, ECF No. 69-36.)

Discussion:  Plaintiffs filing only writes in: "*need to answer this question," and thus has not provided anything to dispute the factual accuracy of Defendant's proffer.  The Court accepts UF 13 as undisputed.

**UF 14.**  On July 1, 2019, Mecca Morgan emailed Hartford to open a new insurance claim for the foundation, due to water damage, "due to new information."  (Carlile-Harris Decl. ¶ 12; Ex. 8, ECF No. 69-10.)

Discussion:  Plaintiffs respond that Morgan opened a new claim "because Calwest demol[ished] part of the foundation tore it out to the dirt in the master bedroom, and so once they tore it out they are responsible to repair it."  (ECF No. 72 at 4.)  Plaintiffs direct the Court to see "pictures in exhibit named ground foundation."  (Id.)  The Court finds Plaintiffs have not disputed the substance of this fact as proffered, and the Court finds UF 14 undisputed.

**UF 15.**  Hartford denied the claim for damage to the foundation by letter on December

1 | 9, 2019, because the foundation damage had existed before the policy was in force, and other

2 | grounds not addressed by this motion.  (Carlile-Harris Decl., Exh. 10, ECF No. 69-12.)

3 |     <u>Discussion:</u>   Plaintiffs respond that "[e]ven though the claim for damage to the

4 | foundation was denied, Calwest who is [a] vendor through the Hartford group is still responsible

5 | for the damages they did to the foundation after they said they would not touch the foundation."

6 | (ECF No. 72 at 5.)  Plaintiff directs the Court to "pictures of damage done by Calwest."  (<u>Id.</u>)

7 | Defendant replies that Plaintiffs dispute this fact with photos which are inadmissible and

8 | unauthenticated.  Plaintiffs have not sufficiently disputed the Defendant's factual proffer and the

9 | Court accepts UF 15 as undisputed.

10 |     **UF 16.**   In 2020, Ms. Morgan reported water damage to the ceiling in the garage, so

11 | Hartford opened a third claim.  (Carlile-Harris Decl. ¶ 16.)

12 |     <u>Discussion:</u>   Plaintiffs respond that "[t]he plumbing is in the attic of the home and when

13 | the sewage busted 1/13/20 [it] caus[ed] the water to come down from the attic [and] Hartford

14 | never sent out a plumbing inspector to check out where the plumbing was."  (ECF No. 72 at 5.)

15 | Plaintiffs direct the Court to "pictures of attic in exhibit."  (<u>Id.</u>)  The Court finds Plaintiffs have

16 | not disputed the content of UF 16 as proffering the reporting of the issue and opening of a claim,

17 | and the Court accepts UF 16 as undisputed.

18 |     **UF 17.**   Hartford denied the claim for damage to the ceiling in the garage because the

19 | damage had manifested itself years before Hartford began to insure the property.  (Carlile-Harris

20 | Decl., Ex. 12, ECF No. 69-14.)

21 |     <u>Discussion:</u>   Plaintiffs respond that "[d]ue to Hartford never sending a professional

22 | plumbing inspector out to the home . . . Hartford did not know the plumbing to the home is in the

23 | attic."  (ECF No. 72 at 5.)  Plaintiffs direct the Court to "pictures of attic in exhibit."  (<u>Id.</u>)  The

24 | Court finds Plaintiffs have not disputed the content of this fact, and the Court accepts UF 17 as

25 | undisputed.

26 |     **UF 18.**   There was evidence of existing tree root damage to the foundation of the home as

27 | far back as 2005 and further evidence of tree root damage in 2010, long before Hartford first

28 | insured the home in 2014.  (Decl. Esteban Pauli ("Pauli Decl."), ECF No. 69-23; Ex. 20 at

BRN000307-308, ECF No. 69-25 at 3-4; Decl. Michael O'Connor, P.E. ("O'Connor Decl.") ¶¶ 3, 4, ECF No. 69-19; Ex. 18 at HCL-284-002160, ECF No. 69-22 at 6; Decl. Doru Botic, P.E. ("Botic Decl."), ECF No. 69-26; Ex. 23 at HCL-284-000841-842, ECF No. 69-29 at 3-4[6]; Brown Dep. 23:21-25:11, 53:11-54:6, 54:13-55:18.)

Discussion:  Plaintiffs respond that "AAA insurance used a sledgehammer to put a hole in the floor in the master bedroom.  That is how the hole and cracks in the master bedroom came to be.  Then Calwest demolition [sic] that same hole down to the dirt and tore it open further." (ECF No. 72 at 5.)  Plaintiff directs the Court to see "before and after pictures."  (Id.)  Defendant replies that Plaintiff responds with inadmissible and unauthenticated photographs.  The Court finds Plaintiffs have not sufficiently disputed the specific factual proffer of Defendant and the Court accepts UF 18 as undisputed.

**UF 19.**  Before Hartford began insuring the home in March 2014, CSAA insured the home.  While CSAA insured the home, it investigated why the floor was "unbalanced."  CSAA put a hole the about the size of a foot in the floor of the home during its investigation.  (Carlile-Harris Decl. ¶ 4; Brown Dep.  23:21-23; 24:1-25:7.)

Discussion:  Plaintiffs' response incorporates the same response as to UF 18.  The Court finds Plaintiffs have not sufficiently disputed the proffer of Defendant and the Court accepts UF 19 as undisputed.

**UF 20.**  While CSAA insured the home, it told Brown that a "heave" in the floor was caused by a tree root.  (Brown Dep. at 54:22-55:18.)

Discussion:  Plaintiffs respond that "Hartford is making the foundation the issue when from the beginning I filed for toxic mold and sewage water flooding my home.  In bad faith they choose not to repair the toxic mold and sewage water damage.  So I added my original statement."  (ECF No. 72 at 6.)  Plaintiffs direct the Court to see exhibits 19, 20, and 21.":  (Id.) Defendant replies that there was no coverage for the damage to the foundation, so Hartford was not obligated to pay for repairs to the foundation, and that Plaintiffs' fact is immaterial to any

---

[6]  While Defendant cites to Exhibit 22, HCL-284-000841-842 in fact appears in Exhibit 23.  (See ECF No. 69-29 at 3-4.)

issue raised by defendant's motion.  (ECF No. 76-1 at 14.)  The Court has reviewed the Plaintiffs' filing and finds Plaintiffs have not sufficiently disputed the Defendant's proffer, and the Court finds UF 20 is undisputed.

**UF 21.**  After CSAA told Brown about the tree root damage, Brown and a neighbor spent several days digging a trench in her yard near a tree and cut the tree root.  (Brown Dep. at 53:7-55:18.)

Discussion:  Plaintiff responds that My neighbor and I removed the tree root to keep it from damaging the home any further.  (ECF No. 72 at 6.)  The Court finds UF 21 to be undisputed.

**UF 22.**  "There was evidence of mold growth in the garage ceiling of the home as of November 2010, long before Hartford insured the home, and an engineer in [sic] opined in 2020 that the ceiling damage was several years old."  (Pauli Decl., Ex. 20 at BRN000308, ECF No. 69-25 at 4; Decl. John You, P.E. ("You Decl."), Ex. 25 at HCL-701-000069-70, ECF No. 69-32 at 7-8.)

Discussion:  Plaintiffs respond that "[t]here was septic sewage overflow in 1/13/2019 and it overflowed in the attic where the plumbing is for the home.  This time it took the ceiling down." (ECF No. 72 at 6.)  Plaintiff directs the Court to pictures of the attic.  (Id.)  Defendant responds that Plaintiffs dispute this fact with photos which are inadmissible and unauthenticated. The Court finds Plaintiffs have not sufficiently disputed Defendant's factual proffer and the Court accepts UF 22 as undisputed.

**UF 23.**  The policy contains a one year suit time clause, so any claim for damage that first manifested itself before January 9, 2019 is time-barred.   (Carlile-Harris Decl. Ex. 1 at HPOL000123, ECF No. 69-3 at 57.)

Discussion:  Plaintiff does not dispute the fact in any filing, and the Court accepts it as undisputed that the policy contains this provision.

/ / /

/ / /

/ / /

**C.    The Court Recommends Granting Hartford's Motion for Summary Judgment**

For the reasons explained herein, the Court recommends granting Defendant's motion for summary judgment.  While the Court will highlight some potential issues or concerns the Court identified that the District Judge should be informed of in order to consider whether partial summary judgment is more appropriate, ultimately, the Court concludes granting summary judgment in favor of Defendant-Counterclaimant Hartford as to all of Plaintiffs' claims and as to Hartford's counterclaim is appropriate.

In sum, Defendant submits that Plaintiffs Brown and Morgan seek to recover for damage to a home which happened years before Defendant insured them and thus moves for summary judgment as it is "a fundamental principle of insurance law that an insurer cannot insure against a loss that is known or apparent to the insured."  Prudential-LMI Com. Ins. v. Superior Ct., 51 Cal. 3d 674, 695 n.7 (1990).  Defendant submits that Plaintiffs' lawsuit seeks to recover for three distinct issues: (1) a sewage backup that happened in January of 2019 for which Hartford claims it has paid all recoverable sums; (2) damage to the slab foundation which has been present and manifest since certainly 2010, and probably since 2005; and (3) water damage to the ceiling of the garage which was first observed in 2010.  In summarizing the counterclaim above, these issues were identified by the Court as the "Sewer Backup Claim," the "Foundation Claim," and the "Garage Ceiling Claim."

Defendant contends it is entitled to summary judgment as it has paid all owed for the Sewer Backup Claim, totaling $155,288.66, including $76,584.36 for the loss of use, (also known as additional living expenses), to accommodate Brown and her family, in addition to the actual cash for the damage to the dwelling which has yet to be repaired, plus the cost of repairs performed, in the amount of $78,704.30.  (Mot. 3; UF 8-11.)  Defendant argues Plaintiffs are not entitled to recover on a replacement cost basis on the Sewer Backup Claim until actual replacement occurs.  Defendant submits that no benefits are due for the Foundation Claim or the Garage Ceiling Claim because the damage predated the Hartford coverage period, which began in 2014.  (Mot. 3-4.)  Specifically, Defendant proffers the foundation slab has been the subject of

continuous unrepaired damage since 2005, and the garage water pipe damage first manifested "years ago."  (Mot. 3.)

       1.     Defendant's Factual Proffer and Arguments

Commencing March 20, 2014, Hartford issued a series of one year homeowners policies to Brown and Morgan, covering a dwelling on Fonda Avenue in Madera, California.  (UF 1.) The policies were renewed through the 2020-2021 policy year.  (Id.)  The policy, effective March 20, 2018, provides coverage for the Property as follows:

**SECTION I – PROPERTY COVERAGES**

**A. Coverage A – Dwelling**

1. We cover:

        a. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

        b. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises".

2. We do not cover land, including land on which the dwelling is located.

(UF 2-3.)

     **a.**     **The Sewer Backup**

The Sewer Backup Claim was reported on January 13, 2019.  (UF 7.)  Hartford paid a total of $78,704.30 for repairs and related work and paid the entire policy limit (plus a small amount) under the "Loss of Use" coverage to permit Brown and others in her family to live in hotels.  (Mot. 4-5; UF 8, 9, 10, 11.)  In the motion, Hartford proffers it did not pay for any costs to repair the failed septic system, as the repair of the failed septic system is not covered, but more importantly, Brown and Morgan have not repaired it and have not submitted any invoices for septic system repairs.  (Mot. 5.)  The Court notes that there is no undisputed fact submitted specifically as to the Defendant's contention that the septic system is not covered, though it may be gleamed from the undisputed fact pertaining to coverage generally.  (See UF 3.)  There is

1  similarly no specific undisputed fact concerning the lack of invoices or repair for the septic

2  system, though such contention can be extrapolated from UF 12 pertaining to no repairs in

3  general since demolition in 2019, as related to the foundation issues.

4        Hartford arranged for Brown and her family to stay, mostly in hotels, at Hartford's

5  expense through third party vendors.  (UF 9.)  In total, Hartford paid $76,584.36 for loss of

6  use/additional living expenses, $4,184.36 more than the policy limits.  (UF 9.)  Defendant states

7  the overpayment is a function of the timing of receipt of vendor invoices Hartford had previously

8  agreed to pay.  (Mot. 5 n.1.)

9        Hartford also paid a total of $78,704.30 for repairs and related work.  (UF 10.)  Those

10  payments included the cost of repairs performed and the actual cash value for those repairs not

11  yet performed.  (UF 11.)  Some of the repairs were not performed because Brown and Morgan

12  never had the foundation repaired.  (UF 12.)

13        **b.    The Foundation**

14        In the midst of the repair and remediation process, the County of Madera informed the

15  contractors that it would not issue permits for the remainder of the repairs unless tree root caused

16  cracking/movement in the slab foundation were repaired first.  (UF 13.)  The foundation of the

17  Property has not been repaired, and no further repair work has been done since the demolition in

18  2019.  (UF 12.)  Defendant proffers the reason the residence is presently unrepaired is the

19  foundation damage must be repaired first.  (Mot. 5; see UF 13.)

20        Defendant proffers that: "The engineers and the consultant who submitted reports to Ms.

21  Brown's prior insurer, CSAA, in 2005 and 2010 during its investigation of claims she made back

22  at those times, all reported the same problems with the slab foundation that also halted the repair

23  work in 2019."  (Mot. 5.)  Defendant also states that "All the engineers and the consultant agreed

24  the foundation damage dated from 2005 to 2010."  (Id.)

25        The Court notes that in support of these statements made in briefing, Defendant cites UF

26  18, which only expressly provides more generally that: "There was evidence of existing tree root

27  damage to the foundation of the home as far back as 2005 and further evidence of tree root

28  damage in 2010, long before Hartford first insured the home in 2014."  (UF 18.)  The Court has

reviewed the evidence cited in support of UF 18.  While the Defendant's statements may flow and are supported by the evidence submitted in support of UF 18, the undisputed fact as submitted to the Court and given to Plaintiffs to respond to as disputed or undisputed, is apparently a more narrow description of the evidence.  The Court finds summary judgment on the Foundation Claim may nonetheless be entered based on the facts contained in UF 18, as well as UF 19-21.

### c.    The Garage Ceiling Pipe Leak

Defendant submits that in January 2020, at about the same time as they filed this action, Brown and Morgan reported a third loss – water damage from a water leak from a water pipe above the drywall garage ceiling.  (Mot. 5; UF 16 ("In 2020, Ms. Morgan reported water damage to the ceiling in the garage, so Hartford opened a third claim").)  Engineer John You, P.E., reviewed the ceiling damage in the garage in 2020 and opined that it was several years old, and an engineer in 2010 noted mold growth on the ceiling.  (Mot. 6; UF 22.)

The Court notes that the 2010 report appears to only state: "Mold growth at Garage north wall."  (ECF No. 69-25 at 4.)  The accompanying picture states "Garage north wall.  Mold growth.  Sign of water intrusion."  (ECF No. 69-25 at 17.)  The picture appears to be positioned showing mold growth on the ceiling portion, however the Court is unable to make such finding, as it would be speculative.  (Id.)

Further, the Court notes that while Defendant proffers the engineer in 2020 opined that the damage was "several years old," it appears the report cited only uses the term "historical." Specifically, the report provides:

> The cause of the reported mold in the garage ceiling is a historical pipe leak in the ceiling.  The multiple brown stain rings and black discoloration at the garage ceiling are indicative of elevated moisture from a leak . . . The multiple brown stain rings at the ceiling are indicative of a historical leak; however, the lack of a leak when the water was turned on for 15 seconds can mean that the leak is a slow leak or that the leak is no longer active.

(ECF No. 69-32 at 8.)

/ / /

/ / /

1        1.     <u>The Court Recommends Granting Summary Judgment on the Breach of Contract,</u>
2              <u>Bad Faith, and Punitive Damages Claims, and Granting Counterclaimant</u>
3              <u>Hartford's Requested Declaratory Relief</u>

The Court now turns to the legal arguments as to the individual types of claims, as proffered by Defendant in support of its motion.

**a.     Breach of Contract**

Under California law, the elements for a cause of action for breach of contact are: (1) the contract; (2) a plaintiff's performance or excuse for nonperformance; (3) a defendant's breach of the contract; and (4) damage to plaintiff resulting from the breach. <u>Prop. California SCJLW One Corp. v. Leamy</u>, 25 Cal.App.5th 1155, 1162, 236 Cal.Rptr.3d 500, 505 (Ct. App. 2018). Defendant submits that that there is no "nonperformance," as it paid all benefits due and did not refuse to pay benefits. Specifically, Defendant argues it paid the actual cash value of the cost of repairs for the sewage leak, including paying over the policy limit for loss of use, and it did not pay benefits to repair the foundation or garage ceiling because the undisputed evidence shows that the damage happened years before Hartford began to insure Brown and Morgan. (Mot. 7.)

Defendant correctly proffers that under a property insurance policy, the following must occur in order for money to be owed: (1) there must be a physical loss or damage due to a covered peril to the insured property, <u>Garvey v. State Farm Fire & Cas. Co.</u>, 48 Cal. 3d 395 (1989); and (2) the physical loss or damage must have first manifested, *i.e.*, become known, or discoverable if the policyholder exercises reasonable diligence, during the policy period, <u>Prudential-LMI Com. Ins. v. Superior Ct.</u>, 51 Cal. 3d 674, 686–87, 798 P.2d 1230 (1990).[7]

---

[7] The Supreme Court of California held as follows:

"We agree that "inception of the loss" should be determined by reference to reasonable discovery of the loss and not necessarily turn on the occurrence of the physical event causing the loss. Accordingly, we find that California law supports the application of the following delayed discovery rule for purposes of the accrual of a cause of action under section 2071: The insured's suit on the policy will be deemed timely if it is filed within one year after "inception of the loss," defined as that point in time when appreciable damage occurs and is or should be known to the insured, such that a reasonable insured would be aware that his notification duty under the policy has been triggered. To take advantage of the benefits of a delayed discovery rule, however, the insured is required to be diligent in the face of discovered facts. The more substantial or unusual the nature of the damage discovered by the insured (e.g., the greater its deviation from what a reasonable person would consider normal wear and tear), the greater the insured's duty to notify his insurer of the loss promptly and diligently.

(Mot. 7.)

i.      Breach of Contract  - The Sewer Backup Claim

Defendants emphasize they have paid over $150,000 for the repairs performed thus far, and the actual cash value of the remaining unrepaired damage.  (Mot. 7.)  Defendant argues under the Policy and California law, to the extent the loss is covered, Defendant is only obligated to pay replacement cost for work actually performed, and the actual cash value of the unrepaired damage, subject to policy limits, which is what Defendant has completed.  The Policy provides:

> . . . Covered property losses are settled as follows:
>
> 2. Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:
> . . .
> d. We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.  Once actual repair or replacement is complete, we will settle the loss as noted in 2.a. and b. above.
> . . .
> e.  You may disregard the replacement cost basis settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You may then make claim for any additional liability according to the provisions of this Condition C. Loss Settlement, provided you notify us of your intent to do so within 180 days after the date of loss.

(UF 5.)  For the unrepaired damage to the Property, Defendant submits that it has paid the actual cash value, which at the time of the January 2019 loss was statutorily defined as:

> (b) Under an open policy that requires payment of actual cash value, the measure of the actual cash value recovery, in whole or partial settlement of the claim, shall be determined as follows:
>
>        (1) In case of total loss to the structure, the policy limit or the fair market value of the structure, whichever is less.
>
>        (2) In case of a partial loss to the structure, or loss to its contents, the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury or the policy limit, whichever is less. In case of a partial loss to the structure, a deduction for physical depreciation shall apply only to components of a structure that are normally subject to repair and replacement during the useful life of that structure.

---

Prudential-LMI Com. Ins., 51 Cal. 3d at 686–87.

Cal. Ins. Code § 2051 (as in effect prior to January 1, 2020).[8]  Defendant submits that the amounts paid for the unrepaired damage were the actual cash value of the damage.  (UF 11.)

Defendant emphasizes that it is important to recognize that it has no obligation to perform the repairs, and Plaintiffs were required to hire a contractor to perform the repairs.  The Policy provides that:

### H.     Our Option

> If we give you written notice within 30 days after we received your signed, sworn proof of loss, we may repair or replace any part of the damaged property with material or property of like kind and quality.

(UF 6.)  Defendant contends this option was not exercised.

ii.     Breach of Contract - The Foundation Claim

Defendant submits that the reason the repairs at the Property have not been completed is Madera County will not issue a permit for the remaining work until the long-standing tree root damage to the foundation is repaired.  (UF 13.)  Defendant argues it has no obligation to pay for those repairs because such damage long pre-dated the time it began to insure the Property.  See Prudential-LMI Com. Ins., 51 Cal. 3d at 699.  Defendant contends the evidence shows the foundation damage was first investigated in 2005, and that it was further investigated in 2010 by experts retained by the prior insurer, CSAA.  (UF 18, 19.)  Defendant highlights that Brown testified that she was aware of the tree root damage before Hartford insured the home, because AAA told her about it, and because Brown and a neighbor dug a trench and cut a tree root in an attempt to prevent further damage.  (UF 19, 20, 21.)  Further, Brown and Morgan have not had the foundation repaired.  (UF 12.)

/ / /

---

[8]  The Court notes the law has not changed significantly as to a partial loss: "(b) Under an open policy that requires payment of actual cash value, the measure of the actual cash value recovery, in whole or partial settlement of the claim, for either a total or partial loss to the structure or its contents, shall be the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury or the policy limit, whichever is less. A deduction for physical depreciation shall apply only to components of a structure that are normally subject to repair and replacement during the useful life of that structure."  Cal. Ins. Code § 2051.

iii.    Breach of Contract - The Garage Ceiling Claim

Defendant argues that similar to the foundation issues, the undisputed evidence shows the pipe had been leaking (and repaired) many years before the loss was reported in 2020, and thus because that damage was manifest long ago, there is no coverage for it under the relevant policies. (Mot. 9.) Above, the Court has noted its concerns about the Defendant's UF 22 and the evidence proffered in support of UF 22. Further, Defendant proffers that in any event, the Policy contains a one year suit time clause (UF 23), so any claim for damage that first manifested itself before January 9, 2019 is time-barred (the sewer backup claim happened on January 13, 2019 so suit on it is timely). (Mot. 9 n.2.)

iv.    The Court Recommends Granting Summary Judgment on the Breach of Contract Claims

Despite the concerns voiced above regarding the scope of some of the undisputed facts as proffered within the Defendant's statement, and as utilized in briefing, the Court finds summary judgment may appropriately be granted on any claims Plaintiff may have for breach of contract arising from the Sewer Backup Claim, the Foundation Claim, and the Garage Ceiling Claim.

**b.    Bad Faith**

Every contract imposes an implied duty of good faith and fair dealing on each party. Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335, 345 (2001) (citing Egan v. Mut. of Omaha Ins. Co., 24 Cal. 3d 809, 818 (1979)); see also Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 36 (1995) ("In sum, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement."). To prove "bad faith," a breach of the implied covenant of good faith and fair dealing, Defendant submits that Plaintiffs must prove Defendant unreasonably withheld policy benefits without proper cause for doing so. See California Shoppers, Inc. v. Royal Globe Ins. Co., 175 Cal.App.3d 1, 55 (1985); 501 East 51st Street, Long Beach-10 LLC v. Kookmin Best Insurance Co., Ltd., 47 Cal.App.5th 924, 937 (2020). As the California Court of Appeal explained:

" 'Before an insurer can be found to have acted in bad faith for its

delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause*.' ... 'Where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute.' ... [¶] 'The "genuine dispute" doctrine may be applied where the insurer denies a claim based on the opinions of experts.' ... Reliance on an expert ... 'will not automatically insulate an insurer from a bad faith claim based on a biased investigation.' ... Although an insurer may rely on experts, summary judgment on a bad faith claim must be denied where the evidence shows 'the insurer dishonestly selected its experts[,] the insurer's experts were unreasonable[,] [or] the insurer failed to conduct a thorough investigation.' "

501 E. 51st St., 47 Cal. App. 5th at 937 (quoting McCoy v. Progressive W. Ins. Co., 171 Cal. App. 4th 785, 793 (2009)).  Further, "[w]here a breach of contract cannot be shown, there is no basis for a finding of breach of the covenant."  San Diego Hous. Comm'n v. Indus. Indem. Co., 68 Cal. App. 4th 526, 544 (1998) ("Bad faith claims are based on the contractual covenant of good faith and fair dealing.").

Breach of the implied covenant of good faith and fair dealing requires proof "the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement."  Chateau, 90 Cal. App. 4th at 346 (quoting Careau & Co. v. Sec. Pac. Bus. Credit, Inc., 222 Cal. App. 3d 1371, 1395 (Ct. App. 1990)).

Defendant contends the evidence demonstrates that it "bent over backwards to accommodate" the Plaintiffs, and the undisputed facts show it paid more than the policy limits for loss of use (additional living expense), replacement cost for the work actually performed, and the actual cash value for the unrepaired damage, and that is all it was obligated to do.  (Mot. 10.) Defendant submits that the Court may find its conduct reasonable as a matter of law as "[w]hile the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference

1   can be drawn from the evidence." <u>Chateau</u>, 90 Cal. App. 4th at 346 (citing <u>Paulfrey v. Blue Chip</u>

2   <u>Stamps</u>, 150 Cal. App. 3d 187, 196 (Ct. App. 1983)); <u>see also</u> <u>Nager</u>, 83 Cal. App. 4th 284, 288

3   (2000) (same).  Here, Defendant emphasizes it paid what it owed – and thus the only possible

4   conclusion is that there was no bad faith as a matter of law.

5        Through the evidence submitted, Defendant has demonstrated a reasonable basis for its

6   handling of the various claims submitted by Plaintiff, a reasonable reliance on contractors and

7   expert reports in making its determinations, and the Court has found no breach of contract

8   between the parties.  Based on the undisputed evidence submitted, and the lack of a direct

9   opposition to the legal arguments presented on the bad faith claim, the Court finds it appropriate

10   to grant summary judgment on Plaintiffs' bad faith claim.  <u>Id.</u>

11        **c.      Punitive Damages**

12        While stating it is unclear from the complaint, Defendant proffers it appears Plaintiffs

13   seek punitive damages.  Defendant argues such claim for punitive damages has no merit, and

14   Defendant is entitled to summary judgment because claims for punitive or exemplary damages

15   require "clear and convincing evidence" that a defendant has been guilty of "oppression, fraud,

16   or malice" in the commission of a tort, and Defendant contends that Plaintiffs have no such

17   evidence.  Defendant submits that without bad faith, there is no tort liability, and thus no basis

18   for an award of punitive damages.  Even if Plaintiffs were able to offer evidence to create a

19   triable issue of material fact on the breach of implied covenant of good faith and fair dealing

20   claim, Defendant highlights that proving such claim does not equate to proving malice, fraud, or

21   oppression under Section 3294.

22        The Court agrees it is unclear from the face of the complaint whether Plaintiffs are

23   seeking punitive damages, but such claims would naturally flow from a finding of bad faith.  The

24   Court also agrees with Defendants that there is no evidence supporting a claim for punitive

25   damages, and that it is entitled to summary judgment on a claim for such damages.

26        "In California, an insured plaintiff may hold its insurer liable in tort for denying her

27   coverage in bad faith by bringing a claim for tortious breach of her insurance contract's implied

28   covenant of good faith and fair dealing."  <u>Shenon v. New York Life Ins. Co.</u>, No.

218CV00240CASAGRX, 2020 WL 227870, at *4 (C.D. Cal. Jan. 13, 2020) ("Because a bad faith claim sounds in tort, it avails a prevailing plaintiff to punitive damages, as well as contract remedies."). "In insurance cases, punitive damages can be most plausibly justified by a finding of oppression or malice." Harbison v. Am. Motorists Ins. Co., 636 F. Supp. 2d 1030, 1044 (E.D. Cal. 2009) (citing Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc., 78 Cal. App. 4th 847, 893 (2000). "With regard to evidence required for the recovery of punitive damages, the same evidence is relevant to both the finding of bad faith and the imposition of punitive damages, but '[t]he conduct required to award punitive damages for the tortious breach of contract is of a different dimension [than that required to find bad faith].' " Id. (alterations in original); Rodriguez v. Wells Fargo Bank, Inc., No. 215CV01303KJMCMK, 2016 WL 4595064, at *9 (E.D. Cal. Sept. 2, 2016) (stating same standard and granting summary judgment on punitive damages claim).

It is appropriate for the Court to apply the clear and convincing standard in consideration of a summary judgment motion. Clear and convincing evidence requires a finding of high probability with the evidence "so clear as to leave no substantial doubt," and "sufficiently strong to command the unhesitating assent of every reasonable mind." Rodriguez, 2016 WL 4595064, at *9 (internal quotations and citation omitted); Hood v. Hartford Life & Acc. Ins. Co., No. CIVS0701634FCD/EFB, 2009 WL 453115, at *4 (E.D. Cal. Feb. 23, 2009) ("Thus, any evidence submitted in response to a summary adjudication must necessarily meet that standard.") (quoting Basich v. Allstate Ins. Co., 87 Cal.App.4th 1112, 1118-21 (2001)). While "the higher evidentiary standard must be taken into account," "the clear and convincing evidence standard does not impose on a plaintiff the obligation to prove a case for punitive damages at summary judgment." Rezvan, 2016 WL 8193160, at *11 (citing Spinks v. Equity Residential Briarwood Apartments, 171 Cal.App.4th 1004, 1053 (2009) (internal quotation marks omitted)). In a "usual case, the question of whether the defendant's conduct will support an award of punitive damages is for the trier of fact, since the degree of punishment depends on the peculiar circumstances of each case." Id.

"Punitive damages are available 'if in addition to proving a breach of the implied

1     covenant of good faith and fair dealing proximately causing actual damages, the insured proves

2     by clear and convincing evidence that the insurance company itself engaged in conduct that is

3     oppressive, fraudulent, or malicious.' " <u>Amadeo v. Principal Mut. Life Ins. Co.</u>, 290 F.3d 1152,

4     1164 (9th Cir. 2002) (quoting <u>PPG Indus., Inc. v. Transamerica Ins. Co.</u>, 20 Cal. 4th 310, 318

5     (1999).  A plaintiff, for example, "may meet the state of mind requirement for an award of

6     punitive damages by showing that the insurer's bad faith was 'part of a conscious course of

7     conduct, firmly grounded in established company policy.' " <u>Amadeo</u>, 290 F.3d at 1165 (quoting

8     <u>Neal v. Farmers Ins. Exch.</u>, 21 Cal. 3d 910, 923 (1978)).  "Conclusory allegations 'devoid of any

9     factual assertions supporting a conclusion [that defendants] acted with oppression, fraud or

10     malice' are insufficient to satisfy Section 3294's requirements." <u>Beckham v. Evanston Ins. Co.</u>,

11     No. 20-CV-03484-JSC, 2021 WL 3173188, at *3 (N.D. Cal. July 27, 2021) (quoting <u>Smith v.</u>

12     <u>Superior Ct.</u>, 10 Cal. App. 4th 1033, 1042 (1992)).

13         Malice is defined as "conduct which is intended by the defendant to cause injury to the

14     plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious

15     disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1).  Oppression is defined

16     as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard

17     of that person's rights." Cal. Civ. Code § 3294(c)(2).  Conduct that is in blatant or knowing

18     violation of the law may satisfy the requisite showing for punitive damages.  <u>See, e.g.</u>, <u>Pac. Gas</u>

19     <u>& Elec. Co. v. Superior Court</u>, 24 Cal.App.5th 1150, 1170 (Ct. App. 2018) ("Punitive damages

20     are appropriate if the defendant's acts are . . . in blatant violation of law or policy," however

21     "mere carelessness or ignorance of the defendant does not justify the imposition of punitive

22     damages," and "some evidence should be required that is inconsistent with the hypothesis that

23     the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-

24     zealousness, mere negligence or other such noniniquitous human failing.") (internal quotation

25     marks and citations omitted); <u>Flyer's Body Shop v. Ticor Title Ins. Co.</u>, 185 Cal.App.3d 1149

26     (1986) (same).

27         Given the undisputed facts demonstrating the reasonableness of the Defendant's handling

28     of the claims in this action, and the previous finding that summary judgment may be granted on

1    the breach of contract and the bad faith claims, the Court finds it may appropriately grant

2    summary judgment in favor of Defendant on Plaintiffs' claim for punitive damages.

3           **d.    Declaratory Relief**

4           Counterclaimant Hartford seeks Declaratory relief as follows: (1) a declaration that

5    Hartford has paid all sums owed to Brown and/or Morgan for the sewer backup loss occurring on

6    or about January 13, 2019; (2) a declaration that the claimed slab damage reported in July 2019

7    is not covered by any of the Hartford policies; and (3) a declaration that the claimed garage

8    ceiling damage reported in January 2020 is not covered by any of the Hartford policies.  (ECF

9    No. 25 at 6.)

10          "The decision whether to grant declaratory relief is within the sound discretion of the

11   district court."  Olagues v. Russoniello, 770 F.2d 791, 803 (9th Cir. 1985).  "The central purpose

12   of the Declaratory Judgment Act . . . is to provide parties with a declaration of their rights prior

13   to incurring actual injury."  Id.  Pursuant to the Declaratory Judgment Act: "In a case of actual

14   controversy," the Court "may declare the rights and other legal relations of any interested party

15   seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. §

16   2201(a).  "This statute does not create new substantive rights, but merely expands the remedies

17   available in federal courts."  Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc., 771

18   F.3d 632, 635 (9th Cir. 2014).  "While the Declaratory Judgment Act therefore created a new

19   procedural mechanism for removing the threat of impending litigation, it did not expand the

20   jurisdiction of federal courts."  Id.

21          For the reasons explained throughout this opinion in support of entering summary

22   judgment, the Court finds the declaratory relief as requested by Counterclaimant Hartford to be

23   appropriate and the Court recommends entering judgment on Defendant's counterclaim and

24   granting such declaratory relief.[9]

25   / / /

26   / / /

27   _____

28   [9]  The Court makes no findings at this time as to the counterclaimant Hartford's requests for costs of suit contained
     in the counterclaim (ECF No. 25 at 6), as this was not requested or presented in the motion for summary judgment.

2.      The Court Recommends Granting Defendant's Motion for Summary Judgment in Full

For the reasons explained in the preceding subsections, the Court finds it may appropriately grant summary judgment on the breach of contract, bad faith, and punitive damages claims, that Hartford has expressly moved for summary judgment on, as well as the request for declaratory relief.  For the reasons explained below, the Court also finds it may appropriately enter summary judgment on all of Plaintiff's claims, enter judgment in favor of Defendant-Counterclaimant Hartford, and close this action.  The Court will first highlight some concerns with the moving papers and the Plaintiffs' pleading originally filed in state court, that the Court considered in relation to the capacity of the Court to enter summary judgment on the entirety of the action.

The Court excerpted the entirety of the Plaintiffs' complaint above.  Certain aspects of the complaint that could be construed to aver to different types of claims that are not expressly discussed in the motion for summary judgment.  On the other hand, the factual assertions contained in the complaint could be construed to fall within the more express discussions by Defendant in their moving papers of claims for breach of contract and bad faith.  Moreover, while the moving papers do not expressly discuss some factual assertions in the complaint, Defendant has moved for summary judgment as to the entirety of the action, has presented undisputed facts demonstrating their reasonable handling of the insurance claims under the relevant policies between the parties in this action, and the factual assertions contained in the complaint can be reasonably construed as falling under the umbrella of the breach of contract and bad faith insurance claims, or simply as part of the motion for summary judgment as to the entirety of the action generally, given the somewhat vague nature of the filed complaint and lack of evidence submitted by Plaintiffs in response to the motion.

Specifically, in one part of the complaint, Plaintiffs states an insurance adjuster and other contractor removed a baseboard, and mold spores are alleged to have caused Brown to become physically ill.  (ECF No. 1-1 at 3.)  Plaintiffs also aver to a negligence claim stating that because the insurance company did not approve a hotel change, Brown was subjected to a pesticide

spraying conducted by the hotel that the insurance was paying for her to stay at, and Brown ended up having to go to the hospital due to the pesticide spraying.  (ECF No. 1-1 at 4-5.)   The complaint also states: "If we have to go to court, I am asking for damages for my health for both times I was injured separately."  (ECF No. 1-1 at 5.)  Finally, the complaint states as another example of bad faith, Hartford hired Calwest, "a company that committed the crime of theft of my rugs which were to be left to my children as family heirlooms; my daughter and I gave clear directions as to what to do with the rugs, but our request went ignored and the rugs are gone, and I have yet to be paid the correct amount for my loss."  (ECF No. 1-1 at 3.)

Thus, these assertions could be construed as a personal injury claim or negligence claim, as well as some type of theft claim.  While Defendant does not discuss any claims of medical injuries in the moving papers, Plaintiff has not presented any assertion or evidence of such in response to the motion for summary judgment as to the entirety of the action, and the absence of any basis for such claim could be derived from the Defendant's evidence submitted concerning the handling of the insurance claims overall.  It is not clear whether the actions of the hotel, and under that, the actions of the pesticide company in the manner of spraying, could be imputed to the insurance company.  To the extent the denial of a hotel change could amount to some liability, it would likely fall under the umbrella of bad faith or breach of contract.  While the motion does not specifically reference facts concerning the rug, the Court finds this more easily falls under the umbrella of the bad faith claim given Plaintiffs state this is an example of bad faith, and Defendant has sufficiently demonstrated a reasonable handling of the insurance claims and an absence of bad faith, and Plaintiffs have submitted no assertions or evidence concerning the rugs.[10]   The Court notes that the cover page for the complaint checks only the box for

---

[10]  When reviewing the documents attached to Plaintiffs' filing, the Court noted that within a letter dated January 3, 2020, from Hartford to Brown, Hartford stated: "Due to the extent of the damages, the rugs needed to be removed from your home to present further mold growth.  Actual Cash Value payments for the rugs were issued in the amount of $3,007.39.  Per the appraisers report the Replacement Cost Value for the rugs is $7,926.05.  Therefore, the maximum amount of recoverable depreciation is $4,918.66, once the rugs are replaced.  Please feel free to forward us any receipts once the rugs are replaced.  I would be happy to further explain the reasoning behind the payment as well, if needed."  (ECF No. 72 at 46.)  Another document submitted by Defendant contains somewhat different numbers.  Specifically, a letter dated December 19, 2019, stated: "The rugs that were throw always [sic] by Calwest construction was because they were contaminated with sewage.  We had these rugs reviewed and it was determine [sic] the replacement cost is $6,982.13, recoverable depreciation was taken in the amount of $4,627.69

1  Contract-Insurance Coverage, as type of claim, but, the instructions do only direct the claimant

2  check one box.  (ECF No. 1-2 at 7.)

3          Even if the Court finds some lack of Defendant's thoroughly addressing the parameters

4  of the complaint as written by the *pro se* Plaintiffs and spelling out the connections and

5  appropriateness of granting summary judgment as to all claims contained therein without

6  specifically referencing aversions to the rug, medical issues from the mold spores from the

7  contractor, or the hotel stay, the Court finds the motion for summary judgment may be

8  appropriately granted in full for the reasons explained below.

9          First, given the failure by Plaintiffs to meet and confer in good faith; to participate in the

10  drafting of a joint statement of undisputed facts; and to file a legal brief in direct opposition and

11  directly addressing Defendant's motion for summary judgment, the Court finds the motion may

12  be appropriately granted as essentially unopposed, at least in that it lacks any pointed relevant or

13  meritorious assertions or arguments.  Indeed, given Plaintiffs' only filing as to this motion was

14  filed on the same date as the motion for summary judgment, the Plaintiffs' filing (ECF No. 72),

15  was not drafted in actual opposition to the filed motion for summary judgment.  Plaintiffs have

16  filed no legal brief actually directly responding to the factual and legal contentions outlined in

17  the Defendant's memorandum, and instead, have only provided a statement responding to an

18  earlier draft of the Defendant's joint statement of undisputed facts that was provided to Plaintiffs

19  prior to the motion for summary judgment actually being filed.

20          "A failure to file a timely opposition may also be construed by the Court as a non-

21  opposition to the motion."  L.R. 230(c); see also L.R. 260(b) ("Any party opposing a motion for

22  summary judgment or summary adjudication shall reproduce the itemized facts in the Statement

23  of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed,

24  including with each denial a citation to the particular portions of any pleading, affidavit,

25  deposition, interrogatory answer, admission, or other document relied upon in support of that

26  denial.  The opposing party may also file a concise 'Statement of Disputed Facts,' and the source

27  _____

28  and payment was issued prior to your [sic] in the amount of $2[,]354.44.  I have enclosed the Explanation of
Payment that reviews how to recover the depreciation."  (ECF No. 69-11 at 2.)

1   thereof in the record, of all additional material facts as to which there is a genuine issue

2   precluding summary judgment or adjudication.  The opposing party shall be responsible for the

3   filing of all evidentiary documents cited in the opposing papers.").  Under Rule 56, "[i]f a party

4   fails to properly support an assertion of fact or fails to properly address another party's assertion

5   of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or

6   address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary

7   judgment if the motion and supporting materials--including the facts considered undisputed--

8   show that the movant is entitled to it; or (4) issue any other appropriate order."  Fed. R. Civ. P.

9   56(e).

10        "The opposing party need not establish a material issue of fact conclusively in its favor; it

11   is sufficient that 'the claimed factual dispute be shown to require a jury or judge to resolve the

12   parties' differing versions of the truth at trial.' "  United States v. Young, No. CV-07-0367-PHX-

13   EHC, 2008 WL 11338794, at *2 (D. Ariz. Nov. 4, 2008) (quoting First Nat'l Bank of Arizona v.

14   Cities Serv. Co., 391 U.S. 253, 288-89 (1968)).  However, "[a] summary judgment motion

15   cannot be defeated by relying solely on conclusory allegations unsupported by factual data."

16   Taylor v. List, 880 F.2d 1040, 1045–46 (9th Cir. 1989).  "Instead, the opposing party must, by

17   affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a

18   genuine issue for trial."    United States v. Young, No. CV-07-0367-PHX-EHC, 2008 WL

19   11338794, at *2 (D. Ariz. Nov. 4, 2008) (citing  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

20   249 (1986));  Phleger v. Countrywide Home Loans, Inc., No. C 07-01686 SBA, 2009 WL

21   537189, at *8 (N.D. Cal. Mar. 3, 2009) ("In responding to a properly supported summary

22   judgment motion, the non-movant cannot merely rely on the pleadings, but must present specific

23   and supported material facts, of significant probative value, to preclude summary judgment.")

24   (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.11

25   (1986); Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir.2002); Fed. Trade Comm'n v.

26   Gill, 265 F.3d 944, 954 (9th Cir.2001)); Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986)

27   ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of

28   evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from

1   this list that one would normally expect the nonmoving party to make the showing to which we

2   have referred . . . ("we do not think the *Adickes* language quoted above should be construed to

3   mean that the burden is on the party moving for summary judgment to produce evidence

4   showing the absence of a genuine issue of material fact, even with respect to an issue on which

5   the nonmoving party bears the burden of proof.  Instead, as we have explained, the burden on the

6   moving party may be discharged by 'showing'—that is, pointing out to the district court—that

7   there is an absence of evidence to support the nonmoving party's case.").

8       "As other courts have noted, '[i]t is not our task, or that of the district court, to scour the

9   record in search of a genuine issue of triable fact[,] [and] [w]e rely on the nonmoving party to

10  identify with reasonable particularity the evidence that precludes summary judgment.' " Keenan

11  v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting Richards v. Combined Ins. Co., 55 F.3d

12  247, 251 (7th Cir.1995)); United States v. Young, No. CV-07-0367-PHX-EHC, 2008 WL

13  11338794, at *2 (D. Ariz. Nov. 4, 2008) ("Plaintiff's failure to comply with the Local Rules have

14  placed an undue burden on the Court and have made it difficult to determine whether there are

15  any genuine issues of material fact . . . [t]he Court may deny Plaintiff's Motion for failure to

16  submit a separate statement of facts.").

17      Despite the Plaintiffs' *pro se* status, and the fact the Court may liberally construe filings,

18  such as allegations in a complaint for purposes of screening, particularly when a *pro se* party is

19  incarcerated, Plaintiffs still owe a duty and obligation to the Court and to the other party to

20  comply the law and rules applicable to federal litigation, particularly here where the parties are

21  not incarcerated.  See Jacobsen v. Filler, 790 F.2d 1362, 1364-66 (9th Cir. 1986) (observing "that

22  *pro se* litigants in the ordinary civil case should not be treated more favorably than parties with

23  attorneys of record," and holding "the district court did not have to inform Jacobsen of the need

24  to file affidavits or other responsive matter before granting summary judgment against him.");

25  Dawnia Simmons v. Marriot Court Yard, No. 19-CV-04431-PJH, 2021 WL 5834225, at *4

26  (N.D. Cal. Dec. 9, 2021) (rejecting unauthenticated evidence by *pro se* plaintiff and finding *pro*

27  *se* party should be treated no differently by court under Ninth Circuit precedent in adjudication

28  of motion for summary judgment) (citing Jacobsen, 790 F.2d at 1364); Blalock v. Kelso, No.

1    217CV1813TLNACP, 2021 WL 4305833, at *2 (E.D. Cal. Sept. 22, 2021) (declining to subject

2    incarcerated *pro se* party to strict application of summary judgment rules, and recognizing

3    distinctions between incarcerated and non-incarcerated *pro se* parties), report and

4    recommendation adopted, No. 2:17-CV-01813-TLN-AC, 2021 WL 5417079 (E.D. Cal. Nov. 19,

5    2021).

6          Nevertheless, given the *pro se* status of the Plaintiffs, the Court has considered the

7    statement of disputed facts provided by Plaintiffs above, however, Plaintiffs' filing failed to raise

8    any dispute as to Defendant's proffered facts, and failed to identify with reasonable particularity

9    any evidence that precludes summary judgment. "In order to defeat

10   a motion for summary judgment, the non-moving party must make more than conclusory

11   allegations, speculations, or argumentative assertions that material facts are in dispute." Sanai v.

12   Sanai, No. C02-2165Z, 2005 WL 1172437, at *6 (W.D. Wash. May 18, 2005) (citing Wallis v.

13   J.R. Simplot Co., 26 F.3d 885, 890 (9th Cir.1994)); Carmen v. San Francisco Unified Sch. Dist.,

14   237 F.3d 1026, 1030 (9th Cir. 2001) ("*Forsberg* is both binding on us and consistent with the

15   majority view that the district court may limit its review to the documents submitted for the

16   purposes of summary judgment and those parts of the record specifically referenced therein.");

17   Sanai v. Sanai, No. C02-2165Z, 2005 WL 1172437, at *6 (W.D. Wash. May 18, 2005)

18   ("However, if no factual showing is made in opposition to a motion for summary judgment, the

19   District Court is not required to search the record *sua sponte* for some genuine issue of material

20   fact.") (citing Carmen, 237 F.3d at 1029); Arvakhi v. Castro, No. 214CV02816CASEX, 2015

21   WL 6039119, at *4 n.6 (C.D. Cal. Oct. 15, 2015) ("Furthermore, to the extent plaintiff provides

22   evidentiary support for her statements, it is either unclear to which evidence plaintiff is referring

23   or whether that evidence is admissible or competent . . . the numerous documents plaintiff has

24   attached, ranging from handwritten notes regarding the activities of her coworkers to self-taken

25   photographs purportedly documenting the deterioration of plaintiff's health, appear to be either

26   incomplete, lacking in foundation, or irrelevant . . . while the Court recognizes that plaintiff

27   generally takes issue with defendants' statement of undisputed facts, to the extent an evidentiary

28   conflict is not readily apparent, the Court accepts as undisputed defendants' supporting

1  evidence."), aff'd sub nom. Arvakhi v. Clemmensen, 678 F. App'x 546 (9th Cir. 2017).

2      As the Ninth Circuit explained:

> Requiring the district court to search the entire record for a genuine issue of fact, even though the adverse party does not set it out in the opposition papers, is also profoundly unfair to the movant. The gist of a summary judgment motion is to require the adverse party to show that it has a claim or defense, and has evidence sufficient to allow a jury to find in its favor on that claim or defense. The opposition sets it out, and then the movant has a fair chance in its reply papers to show why the respondent's evidence fails to establish a genuine issue of material fact. If the district court, or later this court, searches the whole record, in practical effect, the court becomes the lawyer for the respondent, performing the lawyer's duty of setting forth specific facts showing that there is a genuine issue for trial. The movant is then denied a fair opportunity to address the matter in the reply papers. Unless the court holds oral argument and brings up the fruit of its search, the movant never receives notice and an opportunity to be heard on the critical evidence. If given an opportunity, the movant might sometimes be able to show that the appearance of a genuine issue of fact was illusory.

Carmen v. San Francisco Unified Sch. Dist., 237 F.3d at 1031.  The Ninth Circuit held that a "district court may determine whether there is a genuine issue of fact, on summary judgment, based on the papers submitted on the motion and such other papers as may be on file and specifically referred to and facts therein set forth in the motion papers[,] [and] [t]hough the court has discretion in appropriate circumstances to consider other materials, it need not do so." Carmen, 237 F.3d at 1031 ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").  On the other hand, in Jones, the Ninth Circuit stated: "because Jones is pro se, we must consider as evidence in his opposition to summary judgment all of Jones's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where Jones attested under penalty of perjury that the contents of the motions or pleadings are true and correct." Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004).  Although the statement of undisputed/disputed facts submitted by Plaintiffs was electronically signed, none of the arguments, submissions or evidence attached or discussed therein was attested to under the penalty of perjury.  The Court nonetheless considered whether the assertions by Plaintiffs in the

filing had any relevance or merit when addressing each of the undisputed facts above. Above, the Court addressed each of the undisputed facts and finds Plaintiffs have not adequately disputed them, and the Court accepts them as undisputed. See Burghardt-Cobb v. Inch, No. 117CV01563DADSKO, 2020 WL 1974264, at *1 (E.D. Cal. Apr. 24, 2020) ("Here, although plaintiff submitted a statement of disputed facts, each of the disputes noted by plaintiff therein are actually legal arguments, do not challenge the veracity of the underlying facts, or are irrelevant . . . [t]he court therefore considers the material facts of this case to be undisputed.").

Instructive here, in Jacobs, the court considered a balancing of the rules and standards applied in *pro se* cases adjudicating motions for summary judgment, discussing Carmen, 237 F.3d 1026, and Jones, 393 F.3d 918:

> The undersigned resolves the tension between (a) the Federal and Local Rules, and the longstanding "no rummaging required" rule followed in *Carmen*, and (b) the "must consider" exception for *pro se* parties in *Jones*, as follows. Although the Court still is not required to do even a *pro se* litigant's homework for him in marshaling and citing evidence in opposition to summary judgment, the Court also neither (1) may grant summary judgment (against a *pro se* litigant, that is) *solely* for failure to present a valid SGI, nor (2) may choose, due to that failure, to ignore obvious and/or properly-cited evidence for which the Court need *not* "rummage."
>
> Thus, where a *pro se* plaintiff fails to cite specifically to evidence gainsaying the "facts" listed in the moving party's SUF, but it is apparent from a relatively straightforward search through the record that a material evidentiary dispute exists, then the Court should deny summary adjudication despite the plaintiff's failure. Where such an evidentiary conflict is not readily apparent, however, the Court should decline to do Plaintiff's forgone work for him and should grant the motion—even if, with the luxury of unlimited time (or the necessity of a proper SGI), the Court might have located some basis for *denying* the motion instead.

Jacobs v. Woodford, No. CV 07-02618 DOC RZ, 2011 WL 1706470, at *10–11 (C.D. Cal. Mar. 10, 2011), report and recommendation adopted, No. CV 07-02618 DOC RZ, 2011 WL 1706951 (C.D. Cal. May 3, 2011).

While the motion is essentially unopposed, and despite the obvious failure to adhere to this Court's rules for addressing a joint statement of undisputed facts, meeting and conferring with the other party, and to file a formal opposition to the brief as filed by Defendant, "a case

should, whenever possible, be decided on the merits." <u>Falk v. Allen</u>, 739 F.2d 461, 463 (9th Cir. 1984).  The Court has considered the merits of the Plaintiffs' arguments and exhibits contained within the filing that was submitted, and finds no reasonable argument presented that demonstrates summary judgment is inappropriate in this matter.  "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact."  <u>Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.</u>, 210 F.3d 1099, 1102 (9th Cir.2000).  Defendant has done so.  Plaintiff has not established a genuine issue of material fact.  <u>Carmen</u>, 237 F.3d at 1030–31 ("Whether the evidence is attached or not, Rule 56(e) requires that the adverse party's 'response,' not just the adverse party's various other papers, 'set forth specific facts' establishing a genuine issue.").  The Court therefore recommends granting summary judgment in favor of Defendant.

## V.

## CONCLUSION AND RECOMMENDATIONS

For the reasons explained above, the Court finds that Hartford has submitted sufficient evidence in support of their undisputed facts, that Plaintiffs have insufficiently disputed any of the Hartford's proffered undisputed facts, and that Plaintiffs and Counter-Defendants Brown and Morgan have not countered Hartford's demonstration of a lack of evidence in support of Plaintiffs' claims, nor countered the evidence in support of the counterclaim.  Therefore, the Court recommends Defendant-Counterclaimant Hartford's motion for summary judgment be granted and judgment be entered in favor of Hartford on all claims in this action.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.   Defendant-Counterclaimant Property and Casualty Company of Hartford's motion for summary judgment be GRANTED;

2.   Judgment be entered in favor of Defendant Property and Casualty Company of Hartford and against Plaintiffs Carolyn Brown and Mecca Morgan as to all claims in the Plaintiffs' complaint; and

/ / /

/ / /

3   Judgment be entered in favor of Counterclaimant Property and Casualty Company of Hartford and against Counter-Defendants Carolyn Brown and Mecca Morgan as to all counterclaims.

This findings and recommendations is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within thirty (30) days of service of this recommendation, any party may file written objections to this findings and recommendations with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __December 17, 2021__

_____
UNITED STATES MAGISTRATE JUDGE

41